UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

GLENDA BILLIOT                    *          CIVIL ACTION

VERSUS                            *          NO. 09-7510

BOH BROS. CONSTRUCTION CO., LLC   *          SECTION "D"(2)

ORDER AND REASONS

Before the court is a "Motion for Summary Judgment" (Doc. No. 18) filed by Defendant Boh Bros. Construction Co., LLC ("Boh Bros.").   Plaintiff, Mrs. Glenda Billiot, filed a memorandum in opposition (Doc. No. 56).  With leave of court, each Defendant and Plaintiff filed a number of supplemental briefs. (Doc. Nos. 61, 65, 69 and 72).  The motion, set for hearing on Wednesday, March  23, 2011, is before the court on briefs, without oral argument. Now, having considered the memoranda of counsel, the record and the applicable law, the court finds that the motion should be GRANTED.

I. BACKGROUND

Plaintiff alleges that her deceased husband, Mr. Tilden Billiot, was a longshoreman working for Defendant Boh Bros on marine construction projects (the New and Old Interstate 10 Twin Spans) connecting New Orleans and Slidell, Louisiana when he died in the territorial waters of the United States.  Plaintiff submits that she has a cause of action under § 905(b) of the LHWCA and that there are genuine issues of material fact regarding her claim for "vessel negligence."

In this regard, Plaintiff highlights that evidence adduced to date shows that Boh Bros. employed a fleet of vessels to construct the I-10 twin spans over Lake Pontchartrain, including

1

supply barges, crane barges, tugboats and crew boats.[1]  It cannot be seriously disputed that the

decedent Tilden Billiot's job was performed over water.[2]  He worked as a crane operator on

barges, on the bridge deck over navigable water and the south shore dock loading and unloading

vessels.  Indeed, Tilden Billiot spent approximately 11.43% of his time on the Twin Spans

Project[3] and 17.5% of his time loading and unloading various materials and supplies to and from

barges at the South Shore Dock Area.[4]  He also worked from a crane barge with a crew that were

building resin caps and with a 50-ton hydraulic crane on the bridge deck wrecking overhang

forms, etc.[5]

On December 23, 2008, Boh Bros. stopped work on the south shore side of the bridge

because of the waves and traveled closer to the north shore to operate the Cherry Picker crane.[6]

Mr. Billiot's Cherry Picker tipped over on its side and, after about six minutes of the cab

dangling over the water, his unconscious body slipped through the broken glass and into Lake

Pontchartrain.[7]  Capt. Chad Byrd was immediately dispatched to the scene and spotted Billiot's

---

[1]OSHRC Hearing Testimony of Mr. William Moulton at p.206 (Pltf's Exh. D).

[2]*Id*. at p. 208 ("Well, it's a job on the water, so, I mean, one way [to get around the jobsite] is by boat....") (Pltf's Exh. E).

[3]Boh Bros. Letter dated January 28, 2011 ([P]ursuant to the spreadsheet, Mr. Billiot worked no more than 274 hours, out of 2,395.5 total hours on a vessel" – meaning, "11.43% of the time the total time he worked on this Twin Span project.") (Pltf's Exh. F).

[4]I-10 Twin Spans Project, Boh Bros.'s 1/11/2011 report of re Tilden Billiot Duties performed at the Twin Spans from December 3, 2007 to December 23, 2008 (Pltf's Exh. G).

[5]OSHRC Hearing Testimony of Mr. William Moulton at p. 240 (Pltf's Exh. H).

[6]OSHRC Hearing Testimony of Mr. Mark Bailey at p. 515 (Pltf's Exh. I).

[7]OSHRC Hearing Testimony at p. 48 (Pltf's Exh. N).

body in the water – *i.e.*, still unresponsive with his head completely submerged under approximately under eight inches underwater.[8]   Even with the help of Ken Solis, Capt. Byrd could not physically pull Billiot's body into the rescue boat.[9]   The rescue vessel, one of Boh Bros.' 20 foot V-Hull Outboard Cabin crew boats,[10] proceeded to shore with Capt. Chad Byrd and Solis holding onto Billiot body keeping his head above water.[11]

Mr. Billiot died on January 6, 2009.  Plaintiff contends that the vessel was a cause of Mr. Billiot's drowning, considering that Boh Bros. was required to have a lifesaving vessel immediately available, including the ability to secure the worker onboard for safe transportation and immediate first aid.  In this regard, Plaintiff notes that the coroner determined that the decedent's immediate cause of death was prolonged submersion[12] and, ultimately, diagnosed Anoxic Encephalopathy (brain death due to lack of oxygen).[13]

Plaintiff argues that the evidence suggests that Capt. Byrd arrived on the scene within a sufficient amount of time to revive Mr. Billiot.  Plaintiff contends the evidence will show that the designated "lifesaving" vessel was ill-equipped with proper ingress, *inter alia*, and, because of the inadequacies, Billiot's body was not resuscitated in sufficient time to prevent serious brain damage and eventual death.

---

[8]OSHRC Hearing Testimony at p. 89 (Pltf's Exh. L).

[9]OSHRC Hearing Testimony at p. 121 (Pltf's Exh. M).

[10]OSHRC Hearing Testimony at p. 115, 219 (Pltf's Exh. K).

[11]OSHRC Hearing Testimony at p. 121 (Pltf's Exh. M).

[12]*See* Death Certificate in the case of Tilden Billiot (Pltf's Exh. V).

[13]*See* Autopsy Protocal by Dr. Peter Galvan, St. Tammany Parish Coroner (Pltf's Exh. W).

Plaintiff cites C. F. R. § 1915. 158, *inter alia*,[14] and alleges that:

> The failure of Boh Bros. to comply with federal regulations in
> marine construction by making their transportation vessels
> immediately available and safe for the Longshoreman who relied
> on such transportation, caused irreversible damage to his brain,
> and the time his lifeless body spent submerged and then
> negligently dragged through the cold Lake Pontchartrain on
> December 23, 2008, is what caused this fatality. The vessel lacked
> the necessary equipment and the crew lacked manpower and
> training to properly transport Mr. Billiot in a safe and timely
> manner so that he would not suffer serious bodily injury.[15]

Defendant has moved for summary judgment arguing first that Mr. Billiot was not a

seaman, which is uncontested.[16]   Having filed an amended complaint, it is now clear that

Plaintiff seeks to recover under the LHWCA, which expressly excludes from its coverage "a

master or member of a crew of any vessel."[17]   The Jones Act and the LHWCA are "mutually

exclusive compensation regimes."[18]   An injured maritime worker may be entitled to

---

[14]*See also* Secty of Labor v. Boh Bros., OSHRC Dkt. No. 09-1072 Decision and Order re
29 C.F.R. §1926.106(d) (failure to make a lifesaving skiff "immediately available")(Δ's Exh.
"A").

[15]Amended Complaint at¶ III(D) (Doc. No. 55).

[16]Plaintiff submits she has a cause of action under the LHWCA § 905(b) and her claim is
"vessel negligence."  In this regard, she contends that Capt. Byrd was not performing stevedore
work and was a permanent member of the crew of the vessel/crew boat owned by Boh Bros. and
the crew boat was outside of Billiot's work area and under the active control of the vessel owner,
who had a duty to proved a safe means of ingress but did not in the case of its' "lifesaving" skiff.
*See* Plaintiff's Memorandum in Opposition at pp. 12-22 (Doc. No. 56).

[17]*See* 33 U.S.C. § 902(3)(G) (2000).

[18]*Chandris, Inc. v. Latsis*, 515 U.S. 347, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995);
*McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991);
*Swanson,* 328 U.S. at 7, 66 S.Ct. 869, 90 L.Ed. 1045; *Becker v. Tidewater*, 335 F.3d 376, 386
(5th Cir.2003); *Nunez v. B & B Dredging, Inc.*, 288 F.3d 271, 275 (5th Cir.2002)

4

compensation under one regime or the other, but not both.[19]

Assuming that Billiot was a "maritime worker,"[20] Boh Bros. contends that the LHWCA contains exclusivity provisions which bar the wrongful death claim asserted in this particular case. Defendant submits that only longshoremen injured while working on vessels may sue their employer as a vessel operator under the "Captain Fred"[21] doctrine, which arguably does not apply in this case.[22]  Essentially, it is the defendant's position that: (1) Plaintiff bears the burden of proof on the ultimate issue of "vessel negligence" being causally related to the plaintiff's accident and resulting injuries; and (2) Plaintiff has failed to come forward with even a scintilla of evidence in that regard at this late stage in the proceedings.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56.  Under Rule 56 ( c ), the moving party bears the initial burden of "informing the district court of the basis for its

---

[19]*Chandris*, 515 U.S. at 355-56.

[20]In *Boudloche v. Howard Trucking Co.,* 632 F.2d 1346 (5th Cir. 1980), the court held that plaintiff, who was engaged in the business of hauling oil field and marine equipment via truck/tractor trailer rig to inland and dock sites, was covered under the LHWCA based upon the facts that he spent 2 ½ to 5 percent of his work time loading and unloading cargo at unequipped docks where he had do board vessels and he was also expected to assist in loading and unloading at fully equipped docks. *Id.* at 1348; *see also Trotti & Thompson v. Crawford*, 631 F.2d 1214, 1222 n. 19 (5th Cir. 1980) (indicating that it would consider it reasonable to define "harbor worker" to include marine construction workers).

[21]*Smith v. M/V Captain Fred*, 546 F.2d 119 (5th Cir. 1977) "established that in courts of the Fifth Circuit 'an employee (covered by the LHWCA) may sue his employer qua vessel if he was injured as a result of the vessel's negligence.'" *Longmire v. Sea Drilling Corp.,* 610 F.2d 1342, 1351 (5th Cir. 1980).

[22]*See* Defendant's Memorandum in Support of Summary Judgment at p. 3 (Doc. No. 18-2).

5

motion, and identifying those portions of [the record] which it believes demonstrate the absence

of a genuine issue of material fact."[23]  If the burden of proof at trial lies with the nonmoving

party, the movant may either (1) submit evidentiary documents that negate the existence of some

material element of the opponent's claim or defense, or (2) if the crucial issue is one on which

the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the

record insufficiently supports an essential element or claim.[24]  The party moving for summary

judgment must demonstrate the absence of a genuine issue of material fact, but need not negate

the elements of the nonmovant's case.[25]  "An issue is material if its resolution could affect the

outcome of the action."[26]

     If the moving party fails to meet its initial burden, the motion for summary judgment must

be denied, regardless of the nonmovant's response.[27]  When the moving party has met its Rule 56

( c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on

the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the

record and articulate the manner in which that evidence supports that party's claim.[28]  The

---

[23]*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir.2002).

[24]*Celotex*, 477 U.S. at 330.

[25]*Bourdeaux v. Swift Transp. Co., Inc*., 402 F.3d 536, 540 (5th Cir.2005).

[26]*Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir.2003) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

[27]*Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir.2002).

[28]*Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir.2004).

nonmovant must do more than show that there is some metaphysical doubt as to the material facts.[29]

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.[30] "Rule 56 'mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"

### III. ANALYSIS

It is undisputed that Billiot was not a seaman and, for purposes of the instant motion, the court assumes that he was covered by the LHWCA as alleged in plaintiff's Amended Petition.

> To receive benefits under the LHWCA, a worker must satisfy both a situs and status test.... The situs test includes injuries "occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way....)" The status test defines an employee as "any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations .... "In addition, a worker injured in the course of his employment on navigable water is engaged in maritime employment and meets the status test only if his presence on the water at the time of the injury was neither transient nor fortuitous ...."[31]

For an employee to be covered under the Act, a "not insubstantial" amount of the employee's time must take place on the water.[32]

---

[29]*Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir.2003).

[30]*Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir.2002); *Anderson*, 477 U.S. at 255.

[31]*Id.* at 254 (citations omitted).

[32]*Bienvenu v. Texaco, Inc.,* 164 F.3d 901, 908 (5th Cir. 1999).

The court now addresses whether the plaintiff has made sufficient allegations adequately supported by *competent* evidence of "vessel negligence" so as to defeat Defendant's motion for summary judgment.  As with any such motion, the court must resolve all genuine disputes of material fact against the moving party (Defendant/Boh Bros.) and construe every reasonable inference from those facts in favor of the party opposing the motion (Plaintiff/Mrs. Billiot).[33]

In *White v. Cooper/T. Smith Corp.*, 690 F.Supp. 534 (E. D. La. 1988) (Schwartz, J.), the court summarized the applicable law, to wit:

> The Longshore and Harbor Workers' Compensation Act (LHWCA) preserves to longshoreman their pre-existing rights under general maritime law to assert claims for injury caused by the "negligence of a vessel."  Following the 1972 amendments to the LHWCA, however, a person covered by the LHWCA may not assert a claim for unseaworthiness against a vessel owner.  Claims for vessel negligence, commonly called § 905(b) claims, are now generally understood to be governed by a standard of "ordinary, reasonable care under the circumstances."  Because the duties under both a reasonable-care and an unseaworthiness standard often overlap to some degree, it is not necessarily inconsistent for a person to breach both standards (even though he may be liable for breach of only one of these standards).
>
> * * *
>
> While the LHWCA generally forbids an employee covered by the LHWCA from suing his employer, other than for contribution under the LHWCA, for any injuries he sustains in the course and scope of his employment, an exception exists when he is suing his employer for vessel negligence under § 905(b).  Under this well-established dual-capacity doctrine, an employee may sue his employer "qua vessel" if he was injured as a result of the vessel's negligence.  In other words, an employer is not liable for any negligence, but " only for negligence in its 'owner' capacity."

*Id.* at 537-538 (citations omitted).[34]

---

[33]*Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000).

[34]*See also Moore v. AEP Memco LLC,* 2008 WL 3811574 *5 (E. D. La. 2008) (Vance, J.) ("Pursuant to the LHWCA, an employer is not liable for negligence, except in its shipowner capacity.").

8

A vessel owner may be liable to a longshoreman injured during stevedoring operations under three circumstances:

> 1) if the vessel owner fails to warn on turning over the ship of hidden defects of which he should have known.
>
> 2) for injury caused by hazards under the control of the ship.
>
> 3) if the vessel owner fails to intervene in the stevedore's operations when he has actual knowledge both of the hazard and that the stevedore, in the exercise of obviously improvident judgment, means to work on in the face of it and therefore cannot be relied on to remedy it.[35]

In the case at bar, the issue is not whether plaintiff has made proper allegations of negligence against Boh Bros., but whether any such alleged negligence, if proved, constitutes "vessel negligence" within the meaning of 905(b).   It is undisputed that evidence as to the crane's instability and tipping over on the bridge do not constitute proper allegations and evidence of "vessel negligence," within the meaning of the applicable law.   Plaintiff contends that she intends to demonstrate at trial that Mr. Billiot's death was in fact caused by hazards under the control of Boh Bros.' rescue crew boat.

The undisputed fact remains that the accident complained of occurred on the bridge deck and not on a Boh Bros. vessel.   It is also uncontroverted that there is only one accident complained of – *i.e.*, the one on the bridge deck.   After that accident, Capt. Chad Byrd was dispatched by Boh Bros and he spotted Mr. Billiot's still unresponsive body in Lake Pontchartrain with his head completely submerged.   It is undisputed that, while still in crane cab before his body entered the water, Mr. Billiot was wholly unresponsive.   When Capt. Byrd and

---

[35]*Robinson v. Orient Marine Co. Ltd.*, 505 F.3d 364, 365 (5th Cir.2007) (quoting *Pimental v. LTD Canadian Pac. Bul*, 965 F.2d 13, 15 (5th Cir.1992)).

Kenneth Solis attempted to haul the body out of the water, Mr. Billiot was still completely
unresponsive and there is no competent summary judgment evidence to suggest that he had not
already drowned.  Plaintiff has failed to come forward with even a scintilla of competent
*evidence* tending to suggest that Billiot's death was caused by any act or omission on the part of
Boh Bros. in its capacity as owner of the rescue vessel.  There is no evidence that establishes
when Mr. Billiot's brain damage occurred - *i.e.*, whether before or after the rescue crew boat
arrived.  Moreover, it is undisputed that Billiot's lifeless body was found floating in the water
with his head submerged under eight inches of water at the time the rescue vessel arrived.  There
is no evidence suggesting that towing Billiot's body to shore with his head out of the water
decreased his chance of survival.  As to blunt force trauma, there is no evidence which suggests
that blunt force trauma occurred after Billiot's unconcious body slipped out of the broken
window of the crane cab and fell into Lake Pontchartrain.

The coroner's report (Pltf's Exh. W) simply states that the cause of Billiot's death, to wit:
prolonged submersion and blunt force trauma.   Plaintiff's *argument* regarding "vessel
negligence" is that "[i]f the vessel had been able to pull Mr. Billiot immediately out of the water
and provide first aid ... Mr. Billiot would not have drowned."[36]

Only competent summary judgment evidence, not *argument*, will satisfy the plaintiff's
burden in response to defendant's properly supported motion for summary judgment.  Indeed,
Plaintiff provides no factual support or expert testimony to support her theory of the case.  The
evidence adduced to date including all of the testimony from the OSHRC hearings demonstrates
that Mr. Billiot's fatal injuries – traumatic blow in the crane cab, fall into Lake Pontchartrain and

---

[36]Plaintiff's Memorandum in Opposition at p. 11.

drowning – were all sustained before the rescue boat arrived.

None of the cases cited by plaintiff are factually apposite, including *Smith v. Eastern Seaboard Pile Driving, Inc.*, 604 F.2d 789 (2nd Cir. 1979).  In that case, Smith was hired as a leverman aboard the dredge BEVERLY M, which was engaged in excavation off the shore of Jones Beach.  Thereafter, a storm damaged the digging mechanism of the dredge and Smith accepted Eastern's offer to work as a scuba diver to examine damage to the dredge.[37]  Smith was *injured and drowned during scuba diving operations off of Eastern's the tug MARGARET G.*[38] More particularly, Smith entered the water by jumping off of the tug's railing, immediately surfaced, inflated his life vest and signaled for assistance.  The tug captain then maneuvered the tug around the submerged dredge to approach the diver (Smith), who was floundering in the water.  It is clear from the following passage that Smith was injured and drowned due to "vessel negligence" during diving operations which were part of Eastern's repair program *conducted from the tug MARGARET M*, to wit:

> When the tug was repositioned, the life ring was tossed to Smith and he was pulled to the side of the vessel. However, as the men on the tug vainly tried to hoist him aboard, Smith's scuba tank became hooked in the tire bumper on the side of the tug causing his head to be submerged. Johnson, the dredge master, ignored his personal safety and climbed over the side of the tug on to the tire bumpers in order to tie a rope around Smith. After sliding the line as far up around Smith's body as he could, Johnson scrambled back aboard the tug. However, when the men tried to pull Smith up again, the rope caught around his knees and turned him upside down with his head underwater.

---

[37]*See Smith v. Eastern Seaboard Pile Driving, Inc.*, 604 F.2d 789, 792 (2nd Cir. 1979) (noting that Smith had previously sought employment from Eastern as a staff diver).

[38]*Id.*

> By this time, the captain of the Margaret G had called for
> assistance from the tug Callinan which was nearby.  Mutch [the
> President of Eastern] managed to use a knife to cut off Smith's
> diving gear, and with the help of crew members from the Callinan,
> Smith was hauled aboard the Margaret G.  Artificial respiration
> was administered, and Smith was rushed by helicopter to the
> Nassau County Medical Center where he was pronounced dead on
> arrival. An autopsy revealed that he had died of asphyxia due to
> drowning.[39]

The Second Circuit concluded that: (1) responsibility for providing a safe vessel from which to

dive was not delegated to employees acting primarily as repairmen; and (2) Mutch, the president

of Eastern, was in command throughout *supervising the diving/repair operations from the vessel*

and charged with knowledge of the deficiencies of the dive boat operation.

Plaintiff was not injured during stevedoring operations conducted by or on or from a

"vessel."  Boh Bros.' rescue crew boat played no part in causing the crane toppling incident on

the bridge deck, Mr. Billiot's fall into Lake Pontchartrain or drowning.

Defendant aptly notes that, in the case of *Bach v. Trident S.S. Co., Inc.,*[40] the Fifth Circuit

rejected a similar "fail to rescue" argument and declined the invitation to import the "loss of

chance of survival doctrine" into the section 905(b) context.[41]   The *Bach* case involved an

incident boarding *a vessel*, the M/V JAYMAT TRIDENT.   Plaintiff alleged that the crew was

negligent because it failed to provide him with an appropriate means of boarding the ship and

failed to administer CPR and electrical defibrillation.  Notwithstanding the fact that Bach's heart

---

[39]*Id.*

[40]*Bach v. Trident Steamship Co., Inc*. 920 F.2d 322 (5th Cir.), *vacated and remanded*, 500
U.S. 949, 111 S.Ct. 2253, 114 L.Ed.2d 706, *reaff'd on remand*, 947 F.2d 1290 (5th Cir.)
(**reinstating** its previous judgment because *Wilander* had no effect on the court's earlier
decision), *cert. denied*, 504 U.S. 931, 112 S.Ct. 1996, 118 L.Ed.2d 592 (1992).

[41]*Id.* at 325.

attack actually occurred *onboard the TRIDENT*,[42] the court found no vessel negligence causally related to the fatal incident.

The court in *Chaisson v. Hornbeck Offshore Services, Inc.*[43] also rejected the same argument that plaintiff now makes – *i.e.*, that appropriate rescue boats should have been made available.  The court did so notwithstanding the fact that the Chaisson's accident actually occurred on a "vessel."  Chaisson fell from the offshore tug M/V PATRIOT SERVICE into the Mississippi River.  The court's explanation bears repetition:

> The *Scindia* duties "relate primarily to the physical conditions of the ship."  *See Prestenbach v. Global International Marine, Inc.*, 244 F.App'x 557, 561 (5th Cir. 2007).  **Plaintiff has failed to identify any physical condition on the tug that caused Chaisson to end up on the Mississippi River.**  Plaintiff also has identified no physical condition on the tug that was affected by Captain Kennedy and Harris carrying the equipment needing service off the vessel.
>
> * * *
>
> Plaintiff has failed to identify any connection between Kennedy and Harris carrying equipment off the vessel and the Chaisson's entry into the river. **There is no allegation that [crew members] Kennedy or Harris actively caused Chaisson to end up in the water.** Plaintiff complains instead that Hornbeck failed to force Chaisson to wear a PFD, failed to assign a crewmember to escort Chaisson, and failed to provide an operational fast boat to rescue Chaisson. None of these alleged inadequacies is affected in any way by the Captain [Kennedy] and Harris carrying the equipment off the vessel.[44]

Billiot's attempt to distinguish *Chaisson* on the basis that his drowned body was found eight months after his entry into the water fails as there is no meaningful difference.   Whether four

---

[42]Bach boarded the M/V JAYMAT TRIDENT as its compulsory river pilot.  From his small pilot boat he ascended the pilot's ladder to the ship's deck. A few minutes after arriving safely on the bridge of the vessel, he collapsed and died of a heart attack. The crew summoned medical help from shore but no member of the crew attempted CPR techniques.  *Bach*, 920 F.2d at 323.

[43]*Chaisson v. Hornbeck Offshore Services, Inc.*, 2010 WL 1727043 (S. D. Tex. 2010).

[44]*Id.* at ** 4-5 (bolding emphasis added).

minutes, six minutes, ten minutes or eight months "to the rescue," Mr. Billiot was not injured

during stevedoring operations conducted by, from or on a "vessel" or by "vessel negligence."

Moreover, the case at bar is even a stronger case for summary judgment than either

*Chaisson* or *Bach*, *supra*.  Mr. Billiot's accident actually occurred while operating a crane which

was located atop the *I-10 twin span bridge* near the North Shore of Lake Pontchartrain.  Plaintiff

has failed to identify any condition of Boh Bros.' crew boat or conduct of its crew which either

caused Mr. Billiot's crane to topple on the bridge deck or his fall into Lake Pontchartrain.

Plaintiff has failed to present even a scintilla of evidence that raises a genuine issue of material

fact in support of her argument regarding any type of alleged "vessel negligence" being causally

related to Mr. Billiot's crane accident atop the I-10 twin spans, his fall into Lake Pontchartrain or

drowning.   By all accounts, upon the arrival of Capt. Byrd's crew boat, Mr. Billiot's lifeless

body was spotted floating in Lake Pontchartrain with his head submerged approximately eight

inches underwater.

Suffice it to say, this LHWCA case involves *one* accident which occurred on a bridge

deck – not a "vessel" –  and, concomitantly, did not involve any "vessel negligence."

Accordingly and because of the complete absence of evidence on crucial elements of plaintiff's

905(b) claim of "vessel negligence" being causally related to Mr. Billiot's accident, his entry

into the waters of Lake Pontchartrain or his drowning,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. 18) is

GRANTED.

New Orleans, Louisiana, this 4th day of April, 2011.

_____

A. J. McNAMARA
UNITED STATES DISTRICT JUDGE

14